IN THE UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF MARYLAND, NORTHERN DIVISION

FREDERICK JAMES MOORE,

    Plaintiff,

        v.                                CIVIL NO.: WDQ-11-1014

WARDEN JOHN WOLFE, *et al.*,

    Defendants.

\*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*

## MEMORANDUM

A Response to the above-styled Petition for Writ of Habeas Corpus, exhibits, and the Petitioner's Reply, were filed in the above-styled case. There is no need for an evidentiary hearing. *See* Rule 8(a), *Rules Governing Section 2254 Cases in the United States District Courts* and Local Rule 105.6 (D. Md. 2011); *see also Fisher v. Lee*, 215 F. 3d 438, 455 (4th Cir. 2000) (petitioner not entitled to a hearing under 28 U.S.C. §2254(e)(2)). For the following reasons, the Petition will be denied and dismissed with prejudice.

I.    Background

The Petitioner was charged in the Circuit Court for Howard County with the first degree murder of Ashley Nicole Mason. He was tried before a jury, the Honorable Raymond J. Kane, Jr. presiding, on January 28, 2002 through February 1, 2002. ECF No. 1. The following facts were developed at trial, and recounted by the Court of Special Appeals of Maryland:

1

On the night of November 2, 2000, appellant, Scott Brill,[1] and a fourteen-year-old girl named Ashley Nicole Mason arrived at the home of Martise Stewart. While at Stewart's residence, an argument erupted among the three – with appellant and Brill in disagreement with Mason. The argument eventually became violent when Brill punched Mason in the face. Soon after the argument, appellant, Brill, and Mason left Stewart's residence in a small car, with appellant driving and Brill and Mason in the back seat. Several hours later, appellant and Brill returned to Stewart's residence. Appellant indicated to several individuals that he and Brill had killed Mason using a "buck knife" and put her body behind a Pizza Hut Restaurant.[2] Also, appellant had blood smeared on his boots and legs and Brill had multiple lacerations on his arms.

The body of Mason was discovered on November 3, 2000, in a wooded area behind a Pizza Hut Restaurant, located in Howard County, Maryland. Police recovered several items at or near the crime scene and collected various evidentiary samples from the body of Mason. The State contracted with Cellmark Diagnostics, Inc. (Cellmark) to perform a DNA analysis of the collected items and samples and compare the results with the DNA profiles of both appellant and Brill. Cellmark concluded that Moore's DNA profile was present on some of the items and samples collected.

Appellant was indicted for the murder of Mason on January 4, 2001. Appellant did not apply to the Public Defender but instead privately retained Sheldon C. Mazelis, Esquire, to represent him. Mazelis entered his appearance on appellant's behalf on January 16, 2001. Appellant stated that he was able to pay for private counsel only because he recently acquired funds for physical injuries he received in a motor vehicle accident.

On March 7, 2001, the State filed its notice of intention to introduce DNA profile evidence at trial. Appellant requested and was eventually provided with the State's DNA materials. After receiving the materials, appellant paid $1,000 to a DNA expert for the purpose of analyzing Cellmark's results. The DNA expert provided a

---

[1] Brill was also convicted of Mason's murder. Brill was tried in a bench trial in the Circuit Court for Howard County that occurred in October of 2001. He was sentenced to life in prison with the possibility of parole. ECF No. 7, Ex. 25 at 7. In preparation for the Petitioner's trial, trial counsel Mazelis observed Brill's trial.

[2] Danielle Ritter, who testified that Moore had confessed to her, was Frederick Moore's cousin and the girlfriend of Scott Brill. Ritter was fifteen years old and pregnant with Brill's child at the time of the crime. Ritter testified at trial that, several weeks after the murder, Frederick Moore said that "we" (Moore and Brill) killed the victim. ECF No. 1.

2

preliminary opinion regarding the testing methods used by Cellmark, but would not testify at trial without additional payment. Unable to pay for further services from the expert, appellant filed a motion on November 20, 2001, requesting that the Public Defender of Howard County provide financial aid for the testimony of his DNA expert. Although he still retained the services of private counsel, appellant claimed to be indigent. A hearing on the motion was held on January 14, 2002, at which appellant stated he was indigent but made no factual showing establishing his indigency. In response to appellant's motion, a member of the Public Defender's Office explained:

> Upon discussion with [the State's Attorney] and upon reviewing the pleadings, I telephoned Mr. Mazelis and gave him the bad news, which is that the policy of the [Public Defender] is that we do not provide funds for experts in private counsel cases. That was my understanding of the policy. To confirm that, I telephoned the Deputy Public Defender . . . . That is the policy. They are not willing to make an exception.

The trial judge reviewed the budget of the court and concluded that it did not have available funds. As a result, the trial judge denied appellant's request by refusing to provide funding of his expert's testimony and by refusing to order the Public Defender to provide the funding. Appellant was subsequently tried without the testimony of his retained expert and convicted by a jury on February 1, 2002.

ECF No. 7, Ex. 12 at 2-4.

The DNA evidence demonstrated that blood samples taken from the parking lot adjacent to where Mason's body was recovered were from a single source and were consistent with Mason's DNA at all nine loci. ECF No. 7, Ex. 6 at 97-100; *see also* ECF No. 10, Exs. E, G & H, Cellmark Report. "Do-Rags A and B" each contained the DNA of a least three people, with the primary source DNA being consistent with the Petitioner's at each of the nine loci tested. *Id.* at 102-104. DNA from inside the knife recovered near the scene was from a single source consistent with Mason's DNA. DNA evidence taken from the outside of the knife revealed a mixture of sources: the primary source was consistent with Mason. The Petitioner was included

as a possible source at six of the nine loci from the sample taken from the outside of the knife. The results were inconclusive as to Brill. *Id.* at 109-110.

Swabs from the victim's ankles showed a mixture of DNA with no primary source. Brill was included as a possible source and Moore was excluded as a source of that DNA. The DNA also contained types "which could not have originated from Ashley Mason or Scott J. Brill." ECF No. 10, Exs. E, G ,H, J. Vaginal swabs revealed the presence of male DNA but no further conclusions could be made. Testing of the sperm fractions from the victim's anal swabs revealed the Petitioner as a possible source at five of the nine loci; a comparison with Brill was inconclusive. Testing of sperm fractions found on the victim's underwear revealed a mixture of at least two sources. No primary source was determined but the Petitioner was included as a possible donor at all nine loci. *Id.* at 107-113.

The defense theory advanced at trial was that Brill - a large, angry, violent, and intimidating man - killed the victim by himself and the Petitioner was merely present but did not participate in the murder in any way. The defense further sought to prove that despite the prosecution's claims, the Petitioner did not confess to two State's witnesses; instead, Brill was the only one who had confessed.

The Petitioner was convicted of first-degree murder. ECF No. 1. He was sentenced, on August 21, 2002, to a life term of imprisonment. *Id.* He noted a timely appeal in which he raised the following claims, as restated by the court:

I.      Did the trial court err by denying appellant's motion requesting funding for a DNA expert on the grounds of indigency when appellant retained and financed private counsel?

4

II.     Did the trial court err by excluding other crimes evidence of a separately tried and convicted co-defendant?

ECF No. 7, Ex. 12 at 1-2.

The Petitioner's convictions were affirmed. *Id.* The Petitioner's request for review in the

Court of Appeals was granted as to these claims:

I.      Is a criminal defendant who is unable to afford the assistance of a DNA expert, but who has retained private counsel using his limited personal funds, entitled to public funding for expert assistance under Article 27A of the Maryland Code where the most extensive testimony offered against the defendant at trial was that of the State's DNA expert?

II.     Is a criminal defendant who is unable to afford the assistance of a DNA expert, but who has retained private counsel using his limited personal funds, entitled to public funding for expert assistance under the United States and Maryland Constitutions where the most extensive testimony offered against the defendant at trial was that of the State's DNA expert?

III.    Did the ruling below improperly limit this Court's decision in *Sessoms v. State*, 357 Md. 274, 74 A.2d 9 (2000), by denying [petitioner] the opportunity to introduce evidence relating to the past violent acts of a separately tried codefendant, where [petitioner's] trial centered on the relative roles of [petitioner] and that co-defendant and [petitioner]'s theory of the case was that the co-defendant committed the murder alone?

*Id.*, Exs. 13-16.

The State's conditional cross-petition was also granted, as to these questions:

I.      Assuming arguendo that a defendant who has paid for a private attorney using his own funds could, under some circumstances, be considered "indigent" for constitutional or statutory purposes, did Moore fail to establish: (1) his indigence in this case, or (2) that a substantial question existed requiring the testimony of a defense DNA expert or that his defense could not be developed without such testimony?

II.     Even assuming arguendo that the trial court erred in declining to order either the Office of the Public Defender or the Circuit Court for Howard County to provide funds to obtain the testimony of Moore's DNA expert, was such error harmless

5

beyond a reasonable doubt where the DNA evidence was essentially cumulative to evidence from other sources and where there was overwhelming non-DNA evidence establishing Moore's guilt?

III.    Is Moore's complaint regarding the exclusion of evidence unpreserved for appellate review where there was no proffer regarding the contents of the evidence and where one of the witnesses Moore wished to cross-examine about alleged prior assaults by his co-defendant answered "no" when asked if the co-defendant had assaulted her?

*Id.*

On December 14, 2005, the court affirmed the Petitioner's judgment of conviction. *Id.*, Ex. 16. The Petitioner's request for review by the United States Supreme Court was denied on October 2, 2006. *Id.*, Ex. 17.

The Petitioner instituted state post-conviction proceedings on September 27, 2007. *Id.*, Ex. 18. Petitioner alleged that trial counsel had a conflict of interest for: (1) simultaneously representing Moore and Danielle Ritter; and (2) not withdrawing as Moore's representative after the denial of the motion for expert funding. *Id.*, Exs. 18-25. Petitioner alleged that the trial court violated his constitutional rights by not requiring Mazelis to withdraw from the case after the denial of the motion for expert funding. *Id.* Petitioner also alleged that his trial counsel was ineffective in failing to: (1) interview witnesses; (2) subpoena witnesses for trial; (3) introduce Brill's confession; (4) cross-examine Ritter, Crystal Brill, and Martise Stewart effectively; (5) properly handle DNA evidence; and (6) advocate effectively at sentencing. *Id.*

Hearings on the Petitioner's claims were held on March 18-20, 2009, and July 10, 2009, and post-hearing memoranda were submitted by the parties. *Id.*, Exs. 19-24. In an Opinion and Order entered on September 1, 2009, post-conviction relief was denied. *Id.*, Ex. 25. Petitioner

6

filed an application for leave to appeal the adverse findings of the post-conviction court raising

all of the claims raised in his post-conviction proceedings. *Id.*, Ex. 26. The application for leave

to appeal was summarily denied by the Court of Special Appeals in an unreported opinion on

April 15, 2011.[3]

In the instant Petition, the Petitioner maintains that: (1) his constitutional rights were

violated when the court denied him access to public funds for a DNA expert, when the court did

not require his counsel to withdraw, and when his counsel did not withdraw; (2) trial counsel

suffered from a conflict of interest violating his Sixth Amendment Right to Counsel; and (3) he

received ineffective assistance of counsel.[4]

---

[3] The court's mandate issued on May 16, 2011. *Id.*, Ex. 1.

[4] ECF No. 1. The Petitioner asserts a number of ineffective assistance of counsel arguments:
    (1) Petitioner received ineffective assistance when trial counsel failed to:
- (i)   investigate, confront, and cross-examine Danielle Ritter;
- (ii)   introduce the details of Brill's confessions to Ritter and Martise Stewart;
- (iii)   properly cross-examine Martise Stewart-particularly as to Stewart's numerous prior inconsistent statements that were less inculpatory of Petitioner;
- (iv)   subpoena Michael Stewart;
- (v)   introduce other additional exculpatory evidence regarding Brill's violent character;
- (vi)   failure to adequately address the DNA evidence including failing to cross-examine the State's DNA expert when she erroneously stated that Petitioner could not be excluded from the profile of the DNA on the victim's ankle; failing to correct State's incorrect claim that Petitioner's DNA appeared on both ankles; failing to introduce evidence that Brill's DNA matched the DNA found on the knife and on the do-rags at 9 of 9 loci; failed to introduce probability statistics that demonstrated the likelihood that Brill's DNA was on the victim's ankle, the do-rags and the knife; and failing to argue that police failed to conduct a thorough investigation in that they

7

II.    Analysis

   A.    Threshold Considerations

      1.    Timeliness & Exhaustion of State Remedies

The Respondents do not contend, and the Court does not find, that the Petition was filed

outside the one-year limitations period stated in 28 U.S.C. § 2244(d)(1). Further, the Petitioner

no longer has any state direct review or collateral review remedies available to him with respect

to the claims raised in this court. His claims are exhausted for the purpose of federal habeas

corpus review.

      2.    Procedural Default

Before a petitioner may seek habeas relief in federal court, he must exhaust each claim

presented to the federal court by pursuing remedies available in state court. *See Rose v. Lundy*,

455 U. S. 509, 521 (1982). This exhaustion requirement is satisfied by seeking review of the

claim in the highest state court with jurisdiction to consider the claim. *See O'Sullivan v.*

*Boerckel*, 526 U.S. 838, 119 S. Ct. 1728 (1999); 28 U.S.C. § 2254(b), (c). In Maryland, this may

---

failed to obtain, analyze and compare DNA samples from other
young men who attended the party on the night of the murder with
the victim in order to compare it to unidentified DNA found on the
victim's ankles, the knife, and do-rags.

(2)    Petitioner received ineffective assistance of counsel at sentencing in that
counsel failed to:
   (i)    investigate Petitioner's background and character;
   (ii)    interview or present any witnesses regarding mitigation; and
   (iii)    argue in favor of part of the sentence being suspended or that he
deserved a less severe sentence than Brill who was most culpable
for the victim's death.

ECF No. 1.

8

be accomplished by raising certain claims on direct appeal and other claims in post-conviction proceedings. Exhaustion is not required if the Petitioner has no available state remedy when a federal habeas corpus petition is filed. *See Teague v. Lane*, 489 U.S. 288, 297-98 (1989).

Where a petitioner has failed to present a claim to the highest state court with jurisdiction to hear it, whether by failing to raise the claim in post-conviction proceedings or on direct appeal or by failing to timely note an appeal, the procedural default doctrine applies.[5] The parties do not claim, and the Court does not find, that any of the Petitioner's claims have been procedurally defaulted.

B.      Standard of Review

An application for writ of habeas corpus may be granted only for violations of the Constitution or laws of the United States. 28 U.S.C. § 2254(a). The federal habeas statute at 28 U.S.C. § 2254 sets forth a highly deferential standard for evaluating state-court rulings. *Lindh v. Murphy*, 521 U.S. 320, 333 n.7 (1997); *see also Bell v. Cone*, 543 U.S. 447 (2005). This standard is "highly deferential" and "difficult to meet." *Cullen v. Pinholster*, 131 S. Ct. 1388, 1398 (2011); *Harrington v. Richter*, 131 S. Ct. 770, 786 (2011).

A federal court may not grant a writ of habeas corpus unless the state's adjudication on the merits: (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or

---

[5] *See Coleman v. Thompson*, 501 U. S. 722, 749-50 (1991) (failure to note timely appeal); *Murray v. Carrier*, 477 U.S. 478 (1986) (failure to raise claim on direct appeal); *Murch v. Mottram*, 409 U. S. 41, 46 (1972) (failure to raise claim during post-conviction); *Bradley v. Davis*, 551 F. Supp. 479, 481 (D. Md. 1982) (failure to seek leave to appeal denial of post-conviction relief).

9

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding. 28 U.S.C. § 2254 (d). A state adjudication is contrary to clearly established federal law under § 2254(d)(1) when the state court (1) "arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law," or (2) "confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at a result opposite to [the Supreme Court]." *Williams v. Taylor*, 529 U.S. 362, 405 (2000).

Under the "unreasonable application" analysis under 2254(d)(1), a "state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington*, 131 S.Ct. at 786 (*quoting Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). Thus, "an unreasonable application of federal law is different from an incorrect application of federal law." *Id.* at 785 (internal quotation marks omitted).

Further under § 2254(d)(2), "a state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance." *Wood v. Allen*, 558 U.S.290, 301 (2010). "[E]ven if reasonable minds reviewing the record might disagree about the finding in question," a federal habeas court may not conclude that the state court decision was based on an unreasonable determination of the facts. *Id.* **"[A]** a federal habeas court may not issue the writ simply because [it] concludes in its independent judgment that the relevant state-court decision applied established federal law erroneously or

10

incorrectly." *Renico v. Lett,* 599 U.S. 766, 773 (2010) (*quoting Williams v. Taylor,* 529 U.S. 362, 410 (2000)).

The habeas statute provides that "a determination of a factual issue made by a State court shall be presumed to be correct," and the petitioner bears "the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1). "Where the state court conducted an evidentiary hearing and explained its reasoning with some care, it should be particularly difficult to establish clear and convincing evidence of error on the state court's part." *Sharpe v. Bell,* 593 F.3d 372, 378 (4th Cir. 2010). This is especially true where state courts have "resolved issues like witness credibility, which are 'factual determinations' for purposes of Section 2254(e)(1)." *Id.* at 379.

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), erects a formidable barrier to federal habeas relief for prisoners whose claims have been adjudicated in state court. The AEDPA requires "a state prisoner [to] show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error . . . beyond any possibility for fairminded disagreement." *Harrington v. Richter,* 131 S. Ct. 770, 786–87 (2011). "If this standard is difficult to meet" -- and it is -- "that is because it was meant to be." *Id.* at 786. A federal court reviewing a habeas petition will not lightly conclude that a State's criminal justice system has experienced the "extreme malfunctio[n]" for which federal habeas relief is the remedy. *Id.* at 786 (internal quotation marks omitted).

11

C.    Moore's Petitions

1.    Denial of expert funding

Petitioner argued on direct appeal, as he does here, that the trial court's failure to provide

funding for him to secure an expert witness violated his constitutional rights as articulated by the

Supreme Court in *Ake v. Oklahoma*, 470 U.S. 68 (1985) (holding that an indigent defendant's

due process rights include the right to the assistance of an expert to aid in his defense in defined

circumstances).  The Maryland Court of Appeals rejected the Petitioner's claim, finding in

relevant part:

> The bottom line question in this case is whether the State has satisfied its
> constitutional obligations by establishing the [Office of the Public Defender
> ("O.P.D.")], making expert services available to clients of that Office, and requiring
> that, in order for an indigent to receive State-funded expert services, the defendant
> must seek representation by O.P.D.  We conclude that the State has not deprived
> petitioner of any of his constitutional rights by requiring that he apply to the O.P.D.
> for representation before he is entitled as an indigent to State funded expert witness
> services.  The Supreme Court contemplated in *Ake* that States could place restrictions
> on indigent defendants' access to state-funded expert services.  The Court stated as
> follows:
>
> > "This is not to say, of course, that the indigent defendant has a
> > constitutional right to choose a psychiatrist of his personal liking or to
> > receive funds to hire his own.  Our concern is that the indigent
> > defendant have access to a competent psychiatrist for the purpose we
> > have discussed, and as in the case of the provision of counsel we
> > leave to the State the decision on how to implement this right."
>
> *Ake,* 470 U.S. at 83, 105 S.Ct. at 1096.  Thus, while a State might provide funds
> enabling indigent defendants with retained counsel to hire experts of their own
> choosing, *Ake* does not require this approach.
>
> Moore is correct that, if he is indigent, he has a right under *Ake* to state-paid
> supporting services necessary to an adequate defense.  As we have indicated, supra,
> Maryland has established a State-wide public defender system which provides legal
> representation, investigative services, and expert assistance to persons deemed

indigent under Art. 27A § 2. In 1971, the Legislature created the Office of the Public Defender. *See* 1971 Md. Laws, Ch. 209 at 486-94. The purpose of the statutes creating that agency was set forth as follows:

> "It is hereby declared to be the policy of the State of Maryland to provide for the realization of the constitutional guarantees of counsel in the representation of indigents, including related necessary services and facilities, in criminal and juvenile proceedings within the State, and to assure effective assistance and continuity of counsel to indigent accused taken into custody and indigent defendants in criminal and juvenile proceedings before the courts of the State of Maryland, and to authorize the Office of Public Defender to administer and assure enforcement of the provisions of this article in accordance with its terms."

Art. 27A § 1 (emphasis added).

*State v. Miller*, 337 Md. 71, 651 A.2d 845 (1994), is instructive on the question of whether the State may condition the receipt of constitutionally mandated services on representation by the O.P.D. The indigent petitioner in that case, Bernard Miller, had been convicted at trial of kidnapping, robbery, murder, and other related offenses. On appeal, as at trial, he was represented by private counsel on a *pro bono* basis. Miller had refused the representation of the O.P.D., and further refused to permit his attorney to seek appointment as an assigned public defender and thereby submit to the supervision of the O.P.D. Had Miller's counsel taken this step, the O.P.D. would have borne the costs of obtaining a stenographic transcript of the trial proceedings. *Id.* at 74-75, 651 A.2d at 846.

Miller filed in the Circuit Court a motion requesting that the court furnish a transcript without charge. The Circuit Court denied the motion on the grounds that Md. Rule 1-325(b) required the court to pay for a transcript only where a party was eligible for O.P.D. representation, had applied to the O.P.D., and had been declined representation by that agency. *Id.* at 75, 651 A.2d at 846.

On appeal, Miller argued that the requirement that he be represented by, or denied representation by, the O.P.D. before receiving a free transcript violated his rights to equal protection and assistance of counsel. We affirmed the Circuit Court. After ruling that the court had correctly interpreted Md. Rule 1-325(b), we noted that under *Griffin v. Illinois*, 351 U.S. 12 (1956), the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution prohibits a state from foreclosing all opportunity for appellate review by refusing, based solely on a defendant's indigence, to provide a trial transcript. But we also noted that Justice Black, in his plurality

opinion, stated, "We do not hold, however, that Illinois must purchase a stenographer's transcript in every case where a defendant cannot buy it. The [Illinois] Supreme Court may find other means of affording adequate and effective appellate review to indigent defendants." *Id.* at 20, 76 S. Ct. at 591.

We then noted that "[a]llowing the states to create reasonable alternative systems by which the constitutional rights of indigents would be protected is a concept that has been applied to other rights of indigent defendants as well." *Miller,* 337 Md. at 83, 651 A.2d at 850. With respect to equal protection, we concluded as follows:

> "Miller *is* entitled to a free transcript, but he cannot receive it on his own terms; he must go through the Office of the Public Defender. The State is free to place reasonable restrictions on the exercise of Miller's rights, and Rule 1-325(b) is neither arbitrary nor unreasonable in its language or application. There can be no equal protection violation when an individual is denied a right simply because of his own failure to comply with reasonable state procedures and regulations."

*Miller*, 337 Md. at 85-86, 651 A.2d at 852.

Turning to Miller's Sixth Amendment claim, we noted that the Supreme Court has held that although an indigent criminal defendant enjoys the right to assistance of counsel, this entitlement does not translate into an absolute right to counsel of the defendant's choosing. *Id.* at 86-87, 651 A.2d at 852; *see Wheat v. United States*, 486 U.S. 153, 159, 108 S. Ct. 1692, 1697, 100 L. Ed. 2d 140 (1988) ("the essential aim of the Amendment is to guarantee an effective advocate for each criminal defendant rather than to ensure that a defendant will inexorably be represented by the lawyer whom he prefers"); *accord Fowlkes v. State*, 311 Md. 586, 605, 536 A.2d 1149, 1159 (1988) ("for indigent defendants . . . the right to counsel is but a right to effective legal representation; it is not a right to representation by any particular attorney"). We concluded as follows:

> "Failure to provide a free transcript to the indigent appellant cannot interfere with the right to choice of counsel where no such absolute right exists. In the absence of such a right to choice of counsel, there is no constitutional violation when the State requires that an indigent defendant avail himself of the services of the Office of the Public Defender in order to obtain a free transcript.
>
> The State has set up a system by which all indigent appellants are provided effective assistance of counsel, whether represented by the

14

Public Defender's Office or by a private attorney under the supervision of that office. Miller cannot pick and choose which of the State-provided services he wishes to receive; he must accept the available resources as provided under Art. 27A and the Maryland Rules. Miller has not been denied his right to assistance of counsel, because he may apply to the Office of the Public Defender and receive effective representation. The Public Defender system is Maryland's 'alternative solution' as described in *Griffin* and *Bounds* [*v. Smith*, 430 U.S. 817, 97 S. Ct. 1491, 52 L. Ed. 2d 84 (1977)], supra. Public Defender representation, like a transcript, is part of the 'package' provided by the State, and requiring Miller to comply with reasonable State procedures in no way infringes upon his right to assistance of counsel."

*Miller*, 337 Md. at 87-88, 651 A.2d at 853. The United States Court of Appeals for the Fourth Circuit, sitting en banc, agreed with our holding on federal habeas corpus review. *Miller v. Smith*, 115 F.3d 1136 (4th Cir. 1997) (en banc), *cert. denied sub nom. Miller v. Corcoran*, 522 U.S. 884, 118 S. Ct. 213, 139 L. Ed. 2d 148 (1997).

Our holding in *Miller* governs the outcome of the case *sub judice*. Although the Maryland Rules contain no analogue to Md. Rule 1-325(b) with respect to the appointment of experts, the practical effect of nonseverable O.P.D. services under Art. 27A is the same. Indigent defendants may utilize the O.P.D.'s complete "package" of services, or forgo them entirely. While such defendants may face difficult choices, the Constitution does not bar the State of Maryland from requiring them to choose between counsel of their choice and ancillary services provided by the O.P.D.

Assuming *arguendo* that the assistance of a DNA expert was necessary to an adequate defense in the instant case, the State did not deny Moore that assistance. Rather, expert assistance was available to him so long as he complied with the procedural requirement that he apply for legal representation through the O.P.D. Imposing this requirement on Moore did not violate his constitutional rights. *See Wheat*, 486 U.S. at 159, 108 S. Ct. at 1697; *Bounds v. Smith*, 430 U.S. 817, 830, 97 S. Ct. 1491, 1499, 52 L. Ed. 2d 84 (1977); *Fowlkes*, 311 Md. at 605, 536 A.2d at 1159.

*Id.*, Ex. 16 at 33-39 (citations omitted).

The state court's findings survive scrutiny under 28 U.S.C. § 2254(d). The *Ake* Court held:

[T]hat when a defendant demonstrates to the trial judge that his sanity at the time of the offense is to be a significant factor at trial, the State must, at a minimum, assure the defendant access to a competent psychiatrist who will conduct an appropriate examination and assist in evaluation, preparation, and presentation of the defense. This is not to say, of course, that the indigent defendant has a constitutional right to choose a psychiatrist of his personal liking or to receive funds to hire his own. Our concern is that the indigent defendant have access to a competent psychiatrist for the purpose we have discussed, and as in the case of the provision of counsel we leave to the States the decision on how to implement this right.

470 U.S. at 83.

Assuming the reasoning in *Ake* is properly extended to DNA expert evidence, it is clear that the implementation of the provision of ancillary services and experts to indigent defendants is left to the States.[6] As recounted by the Maryland Court of Appeals, Maryland has implemented the right to access experts as delineated in *Ake* through the O.P.D. a way that protects an indigent defendant's constitutional rights. Having to choose an "all or nothing" approach for representation from the O.P.D. does not violate an indigent defendant's rights. The Court of Appeals' rejection of the Petitioner's claim was not an unreasonable application of federal law to the facts of the case and will not be disturbed. *See* 28 U.S.C. § 2254(d).

---

[6] As noted by the state court, this Circuit has upheld Maryland's requirement that to obtain a free trial transcript for a direct appeal, an indigent criminal defendant must apply for representation with the OPD. *See Miller v. Smith*, 115 F.3d 1136, 1142-43 (4th Cir. 1997) (this prerequisite to obtaining free transcript for appeal does not violate defendant's Sixth and Fourteen Amendment rights). The Miller Court found that the state's refusal to pay for the trial transcript for an indigent defendant's appeal -- when the defendant was represented by pro bono private trial counsel -- did not violate the Sixth or Fourteenth Amendment because the defendant could have availed himself of assistance through the OPD and received a free trial transcript, but chose not to. *Id.*

2. Trial court's failure to require trial counsel to withdraw

The Petitioner maintains that the trial court should have required Mazelis to withdraw from representing him when the motion for expert funding was denied, and the failure to do so violated his constitutional rights. ECF No. 1. In reviewing this claim, the post-conviction court found that Mazelis offered to withdraw, but the Petitioner asked Mazelis to remain in the case. *Id.*, Ex. 25 at 29-36. Factual determinations made by the state court are presumed correct under 28 U.S.C. 2254(e)(1); *Cagle v. Branker*, 520 F. 3d 320, 323-24 (4th Cir. 2008). Further, the Petitioner's right to trial counsel of his choosing was protected by requiring Mazelis's removal from the case. *See e.g. United States v. Gonzalez-Lopez*, 548 U.S. 140, 144-48 (2006); *Wheat v. United States*, 486 U.S. 153, 159 (1988). The Petitioner has also failed to demonstrate any prejudice from proceeding to trial with Mazelis and without the requested expert funding, as there is no evidence that the O.P.D. would have handled the case in a materially different way. Accordingly, this is not a basis for relief.

3. Conflict of Interest

The Petitioner maintains that his Sixth Amendment right to counsel was violated by trial counsel's simultaneous representation of Danielle Ritter, a key State's witness against Petitioner, and Petitioner during trial. ECF No. 1. The Petitioner also alleges that Mazelis acted in his self-interest by remaining in the case, to keep the fee he had collected and to continue his involvement in a high profile case, after the denial of the expert witness funding. The Petitioner faults Mazelis for collecting a low fee and applying no portion of it for a DNA expert. *Id.*

The *Strickland v. Washington,* 466 U.S. 668 (1985), test for ineffective assistance of

17

counsel is not applied in its totality when a fundamental constitutional deprivation occurred due to counsel's deficient performance. A fundamental constitutional deprivation is alleged here: a claim that counsel had a conflict of interest.

Effective assistance of counsel requires adherence to the duty of loyalty and the duty to avoid conflicts of interest; a breach of these duties may cause ineffective representation. *See United States v. Tatum*, 943 F.2d 370, 375 (4th Cir. 1991). More than a possibility of a conflict must be shown: the Sixth Amendment is implicated only when the representation is adversely affected by an actual conflict of interest. *Id.* When a defendant informs the trial court of a possible conflict of interest, the trial court must follow the *Glasser/Holloway* standard.[7] Under this standard, when the defendant timely demonstrates a potential conflict of interest to the trial court, the trial court must determine whether the conflicts warrant separate counsel. If a trial court fails to take these steps, reversal is automatic without a showing of prejudice.

When a possible conflict exists, but the trial court is not timely informed of the conflict, the *Cuyler* standard applies.[8] Under *Cuyler*, a defendant must show that a conflict adversely affected his lawyer's performance. *Id.* The *Cuyler* standard requires an adverse effect. *Id.* The adverse effect is not presumed as in the *Glasser/Holloway* approach. *Id.* Both standards require an actual conflict of interest.

It is clearly established federal law that the Sixth Amendment "right to counsel is the right

---

[7]*See Glasser v. United States*, 315 U.S. 60 (1942); *Holloway v. Arkansas*, 435 U.S. 475 (1978).

[8]*See Cuyler v. Sullivan*, 446 U.S. 335 (1980) (active representation of actual conflicting interests which adversely affects an attorney's performance is required to state a conflict of interest claim)

to the effective assistance of counsel." *Strickland*, 466 U.S. at 686 (internal quotations omitted). The right to effective assistance includes the right to conflict free representation. *See Rubin v. Gee*, 292 F.3d 396, 401 (4th Cir. 2002) (*citing Cuyler v. Sullivan*, 446 U.S. 335, 348-50 (1980). The Supreme Court has emphasized that the duty of loyalty is "perhaps the most basic of counsel's duties." *Strickland*, 466 U.S. at 692. An adverse effect, however, cannot be presumed solely from the existence of a conflict of interest. *See Mickens v. Taylor*, 535 U.S. 162, 170-75 (2002); *Rubin*, 292 F.3d at 401.[9]

The post-conviction court extensively analyzed the Petitioner's multiple claims of conflict of interest and his arguments regarding their affect on Mazelis's representation. In denying this claim, the state post-conviction court found that there was no indication that the OPD would have proceeded in a materially different fashion. The court also found, as noted above, that after the motion for expert funding was denied, Mazelis advised the Petitioner that he would refund the fee, and the Petitioner could seek OPD representation and use the fee for an expert, but the Petitioner asked Mazelis to stay in the case. *Id.*, Ex. 25 at 29-31, 35; Ex. 18 at 75-76, 130-33; Ex. 20 at 156-58.

In rejecting the Petitioner's claims, the post-conviction court found that the claims were specious, and Mazelis's financial self-interest would have been better served by withdrawing from the case. The court noted that "Mazelis had no duty, responsibility or obligation, legally or ethically, to withdraw under the circumstances. . . . ." *Id.* at 27; *see Jones v. Polk*, 401 F. 3d

---

[9]Thus, even if the Petitioner had demonstrated that trial counsel had actual conflict of interest, an adverse effect was not demonstrated.

2547, 267 (4th Cir. 2005) (to establish a conflict of interest it must be shown that counsel's and client's interests diverged with respect to a material fact, legal issue, or cause of action).

The record is clear that Mazelis represented Danielle Ritter, a State's witness, in civil matters including a personal injury automobile tort case which was pending when Moore retained Mazelis. Mazelis also had represented Ritter's parents in tort cases. Mazelis testified at the post-conviction hearing that Ritter's personal injury case had been resolved when the Petitioner was tried, and his representation of Ritter did not diminish his representation of the Petitioner. *Id.*, Ex. 19 at 131-136; Ex. 20 at 179-80. Mazelis testified, "To me it wasn't an issue, I was going to attack her, as I did, as you know from the testimony at trial and the cross-examination. I felt that I attacked her as well as any other attorney would have attacked a witness for the State." *Id.*, Ex. 19 at 131. The state post-conviction court found Mazelis's testimony credible and also found that "neither Ritters' and her family's civil case interests directly related to nor conflicted in any significant way with those of Moore in his criminal case as reflected by the record herein. Thus, none of the civil clients did or were likely to exert control or improperly influence Mazelis's performance in his representation of Moore in the underlying criminal case." *Id.* at 15.

During post-conviction proceedings, Mazelis testified that when he learned Ritter would be a state's witness, he informed the Petitioner about the representation of Ritter, and the Petitioner asked him to remain in the case. *Id.*, Ex. 19 at 117-21, 128-31, 142. Although the post-conviction court found that Mazelis should have created a record of the Petitioner's waiver of the conflict, the Petitioner failed to demonstrate an actual conflict. The court further found no evidence that the Petitioner was prejudiced by the dual representation. The post-conviction court

20

credited the detailed testimony of Mazelis about his discussions of the alleged conflicts with the Petitioner, and found that there was neither a conflict of interest nor an adverse effect on the representation of the Petitioner. *Id.*, Ex. 25.

In light of the deferential standard of review mandated by statute, the Petitioner has not shown that the state court's decision was an objectively unreasonable application of federal law as established by the Supreme Court. *See* 28 U.S.C. § 2254(d). The post-conviction court recognized that when a conflict due to multiple representation is raised, the standard applicable is that stated in *Cuyler v. Sullivan*, 446 U.S. 335 (1980), and *Mickens v. Taylor*, 535 U.S. 162 (2002). Absent clear and convincing evidence to the contrary, the state court's findings that:

> Neither an actual conflict of interest nor resulting actual adverse effects on representation [had been demonstrated]. Nor does it find Mazelis's trial representation was ineffective because of violation(s) of some actual duty of or lingering sense of loyalty to his present or former civil clients . . . .[10]

and that

> Neither Ritter's and her family's civil case interests directly related to nor conflicted in any significant way with those of Moore in his criminal case as reflected by the record herein. Thus, none of those civil clients did or were likely going to exert control or improper influence of Mazelis's performance in his representation of Moore in the underlying criminal case[11]

may not be disturbed. Accordingly, this is no basis for overturning the court's decision. *See*

*Cuyler*, 446 U.S. at 348-49; *Mickens v. Taylor*, 535 U.S. 162, 171 n.5 (2002).

---

[10] ECF No. 7, Ex. 25 at 19.

[11] ECF No. 7, Ex. 25 at 15.

21

4.    Ineffective Assistance of Counsel

When a petitioner alleges a claim of ineffective assistance of counsel, he must show (1) that counsel's performance was deficient and (2) the deficient performance prejudiced his defense. *See Strickland v. Washington*, 466 U.S. 668, 687 (1984). The second prong requires the Court to consider whether there was a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Id.* at 694. A strong presumption of adequacy attaches to counsel's conduct: a petitioner alleging ineffective assistance of counsel must show that the proceeding was rendered fundamentally unfair by counsel's affirmative omissions or errors. *Id.* at 696.

Whether retained or appointed, defense attorneys do not have infinite amounts of money and time with which to investigate and pursue all plausible lines of defense, nor is such conduct realistic or constitutionally mandated. *See Washington v. Watkins*, 655 F.2d 1346, 1356 (5th Cir. 1981) ("[C]ounsel for a criminal defendant is not required to pursue every path until it bears fruit or until all conceivable hope withers.") (internal quotation marks and citations omitted). That counsel could have conducted a more thorough investigation that might have borne fruit does not establish that the attorney's performance was outside the wide range of reasonably effective assistance. *See Burger v. Kemp*, 483 U.S. 776, 794-95 (1987). Counsel should be strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment, and the burden to show that counsel's performance was deficient rests on the defendant. *See Burt v. Titlow*, 134 S.Ct. 10 (2013).

22

Absent clear and convincing evidence to the contrary, a claim that counsel's decision was premised on trial strategy cannot be disturbed. *See Evans v. Thompson*, 881 F.2d 117, 125 (4th Cir. 1989). Using this analysis, the Petitioner's numerous claims of ineffective assistance of counsel during trial and at sentencing will be considered.

        i.        Failure regarding witnesses Danielle Ritter, Martise Stewart, and Michael Stewart:

The Petitioner alleges counsel was ineffective in his cross-examination of Danielle Ritter and Martise Stewart, and in his failure to call Michael Stewart to testify at trial. On direct appeal, the Petitioner characterized the testimony of these witnesses as follows:

> The only non-DNA evidence linking Moore to the murder itself is the impeached testimony of two witnesses: Martise Stewart and Danielle Ritter. When questioned by the State on direct examination, Stewart stated that Moore confessed to the murder. T 4-188. On cross-examination, however, it was revealed that during his grand jury testimony Stewart had attributed the confession to Brill alone, not Moore. T 4-211. Ritter's testimony was even more equivocal. Under repeated pressure from the State to inculpate Moore, Ritter answered at least nine times to the effect that Moore "didn't really say who stabbed" the victim, and he "didn't say" who used the knife. T 3-181 to 3-182. Finally, she relented, giving the State the testimony it sought. T 3-182 ("Q: Did he say who killed her? A: (Crying) He said - he said we."). On cross-examination, Ritter quickly retreated and denied that Moore had confessed. T 3-193. Ritter had been diagnosed with a precursor to schizophrenia and believed she "heard voices" during the period when she allegedly had the conversation with Moore in which he confessed.

ECF No. 7, Ex. 9 at 14.

Mazelis testified at the post-conviction hearing that his cross-examination of Ritter as to her psychiatric history proved the point he was trying to make. ECF No. 7, Ex 19 at 145, 153-55. Mazelis testified, "I felt at least two of the jurors -- as I recall, two the jury members, as I recall, indicated a positive shake of the head, as, oh, she's got issues." *Id.* at 155. The record reflects

that Mazelis's cross-examinations of Ritter and Stewart questioned the reliability of their testimony. ECF No. 7, Ex. 25 at 42, 54, 62.

The Petitioner's argument that trial counsel should have gone further in impeaching these witnesses with their prior statements amounts to nothing more than "Monday morning quarter-backing." The strategy advanced by the Petitioner, specifically that trial counsel should have impeached each witness with prior inconsistent statements, risked introducing additional inculpatory evidence. Contrary to the Petitioner's assertions, trial counsel succeeded in impeaching both witnesses without allowing the State an opportunity to introduce additional evidence that rehabilitated the witnesses or further inculpated the Petitioner. Trial counsel's choices regarding what to emphasize on cross-examination were reasonable strategic decisions.

The Petitioner also argues that trial counsel was ineffective for failing to impeach Ritter with evidence that Brill coached her testimony during the Petitioner's trial. The transcript demonstrates, however, that Ritter implicated Brill and Moore in the murder of Mason, notwithstanding any pressure Brill exerted on Ritter. The post-conviction court concluded, "Thus, as noted, through his cross-examination, Mazelis made a record of her [Ritter's] erratic and emotional performance, her arguably inconsistent and, at times, unresponsive testimony, and her shaky demeanor on the witness stand, and he argued to the jury that all or a portion of her testimony about what Moore had told her should be disregarded." ECF No. 7, Ex. 25 at 42. The post-conviction court further found that there was no ineffective assistance of counsel in Mazelis's failure to investigate or introduce evidence as to Brill's coaching Ritter in her testimony. The court found that "it would have been a very dangerous road for defense counsel

24

to go down not knowing whether the jury might only believe the portion that Moore confessed to committing the murder but not that part that it was allegedly purported to be a lie that Ritter had been coached by Brill to testify to." *Id.* The court found this theory of error to be nothing more than a "vague hope" that the jury would have considered all of Ritter's later recanted testimony about Moore's confession. The post-conviction court found that trial counsel was not ineffective for failing to introduce this evidence.[12] *Id.*, Ex. 25 at 47-54. This state court finding survives scrutiny and will not be disturbed.

The Petitioner also alleges counsel was ineffective for failing to subpoena Michael Stewart who, he asserts, would have "provided testimony contradicting that of his brother Martise Stewart." ECF No. 1. The trial transcripts indicate counsel attempted to obtain Michael Stewart's testimony during trial but was unsuccessful. There is nothing before this Court that indicates that Michael Stewart's testimony would have helped the Petitioner. To the contrary, the post- conviction court found that Michael Stewart's testimony could have undermined the defense. *Id.*, Ex. 20 at 146-9.

The post-conviction findings are supported by the evidence from the post-conviction proceeding and a review of the trial evidence. The Petitioner has failed to carry his burden about this claim.

---

[12] The Petitioner has produced evidence that Brill wrote to Ritter on several occasions coaching her on how to testify and instructing her to implicate only the Petitioner in the murder. The record shows that Ritter did not follow those instructions, as she implicated Brill and the Petitioner.

25

ii.      Failure to introduce details of Brill's confessions to Ritter and Martise Stewart

The Petitioner maintains that counsel's failure to introduce details of Brill's confession forfeited the opportunity to demonstrate that details Brill told Ritter and Stewart mirrored the facts they attributed to the Petitioner's confessions. The Petitioner maintains that development of Brill's confessions would have bolstered trial counsel's theory that the Petitioner had not confessed to anyone. ECF No. 1.

However, details of Brill's confession to Stewart were introduced at trial. Further, the post-conviction court opined that additional development of this evidence through Ritter would not have benefited the Petitioner because "introducing Scott Brill's confession could have only put before the jury additional evidence that he and Petitioner killed Ashley Mason together." ECF No. 7, Ex. 25 at 39. In its review of Moore's trial record and the evidence produced at the post-conviction hearing, the state court stated:

> [T]his Court finds merit in the State's position and finds that there was not a single witness for Mr. Mazelis to call, not a single confession for Mr. Mazelis to introduce, that would have placed the murder of Ashley Mason on just one person, Brill. Scott Brill's confession, at a minimum, placed the blame on both. At a maximum, it put it on Moore. Mr. Mazelis appropriately kept that evidence from the jury, or, at least, sufficiently diffused some aspects of Ritter's direct testimony harmful to Moore, through his cross-examination of her.

*Id.*

The post-conviction court's rejection of this claim was a reasonable application of Supreme Court precedent and a reasonable finding of facts. The decision will not be disturbed.

26

iii.    Failure to introduce other exculpatory evidence about Brill's violent character

The Petitioner alleges that trial counsel erred in failing to introduce evidence of Brill's violent character and created the impression that Brill was meeker than the Petitioner. ECF No. 1. Evidence regarding Brill's violent nature was introduced at trial, through the testimony of Stewart, which showed Brill's inhumane treatment of Mason at the party. Trial counsel's efforts to introduce other evidence of Brill's violent nature were thwarted by the trial court, whose rulings were upheld on appeal. Notwithstanding the failure to introduce additional testimony about Brill's violent nature, trial counsel argued during closing arguments that Brill was the bigger, stronger, more callous of the two men, describing Brill as an "animal" who "turned savage in front of Moore and killed Mason." *Id.*, Ex. 7 at 133-46. Counsel was not ineffective in his effort to demonstrate Brill's violence. That the jury found the Petitioner was culpable for the murder, does not show ineffective assistance of counsel.

iv.    Failure to adequately address DNA evidence.

The Petitioner raises many claims about trial counsel's handling of the DNA evidence, and lists a number of missed opportunities for counsel to inculpate Brill. ECF No. 1 at 18-21, 28. A review of the record, however, indicates that the DNA evidence inculpated the Petitioner and Brill and placed both of them at the scene of Mason's murder, a fact the Petitioner does not dispute. The post-conviction court recognized that the DNA evidence was not the "lynchpin" of the State's case for while it was persuasive, it was cumulative to other trial evidence of the Petitioner's guilt. *Id.*, Ex. 25 at 71-73.

27

This Court finds, given the wealth of other evidence of the circumstances of this murder in evidence, i.e., other physical evidence, inculpatory observations by other witnesses of both of the convicted perpetrators, immediately before and after the murder, as well as statements by both men that they were present and both participated in the acts that killed the victim, that if the jury had heard that Cellmark Report evidence it would not have created a reasonable possibility of a not guilty verdict for Moore. The DNA evidence in the underlying case was simply not that crucial when placed in context with the unique facts and status of other evidence therein . . . .

*Id.* at 71.

Moreover, trial counsel consulted with an expert regarding DNA evidence, its use in the Petitioner's case, and the import of the samples and results. *Id.*, Ex. 20 at 30-31. The expert assisted counsel in formulating specific questions for trial and provided information about forensic DNA analysis and the difficulty, at that time, in rendering opinions. *Id.* at 32, 36. Further, Mazelis conducted his own research about DNA evidence. *Id.* at 193-200. At trial, counsel cross-examined the State's DNA expert about the potential for errors or ambiguity in DNA testing. *Id.,* Ex. 6 at 120-59, 168-9.

Here, as in state court, the Petitioner goes to great efforts to address counsel's failure to present evidence that foreign DNA was found on Mason's ankles. ECF No. 1, at 28. However, that evidence was at odds with the Petitioner's version of events: only he and Brill were at the scene of the murder, and Brill acted alone.

As to Petitioner's complaint that trial counsel failed to demonstrate that the Petitioner's DNA was not on the victim's right ankle, the post-conviction court correctly noted that such evidence was not evidence of the Petitioner's innocence. *Id.*, Ex. 25 at 71-72. The absence of evidence of DNA on the victim's ankle, in light of all of the other evidence against the Petitioner,

28

was not prejudicial to the defense. Although the post-conviction court found that trial counsel should have objected to the State's incorrect characterization of the evidence during closing argument, i.e., that the Petitioner's DNA was on Mason's right ankle, the court further found that trial counsel mitigated this error by arguing during closing that the DNA evidence did not prove that the Petitioner committed the crime. *Id*. at 73-74.

Additionally, as noted above, the non-DNA evidence against Moore was sufficient to sustain his conviction. Moore confessed to participating in the murder to two witnesses. His knife was used in the killing and his "do-rags" were caught in branches a few feet from Mason's body. Testimony indicated that Moore had encouraged Brill to hit Mason when she wanted to be taken home. Mason left the party in a car driven by the Petitioner. When the Petitioner and Brill returned to Stewart's house a few hours later, Moore had blood on his shoes and pants. He was observed washing down his car. The boots he wore the night of the murder were never found. In light of the foregoing, the Petitioner has failed to show any prejudice arising from any mishandling of the DNA evidence by trial counsel. This post- conviction court's findings are objectively reasonable, given the testimony at the post-conviction hearing, and are supported by the trial transcript. As the post- conviction court's finding will be deemed presumptively correct, pursuant to 28 U.S.C. § 2254(d), (e), there is no cause to disturb the post-conviction court decision.

v.     Sentencing

The Petitioner alleges trial counsel provided ineffective assistance at sentencing because he failed to conduct any investigation into his background or character, failed to interview and

29

present witnesses who could have offered mitigation evidence, and failed to ask the court to impose a suspended sentence. The Petitioner again faults trial counsel for failing to demonstrate that Brill was more culpable in Mason's murder, and Moore deserved a lesser sentence than the life sentence Brill received. ECF No. 1. The state post-conviction court rejected the Petitioner's claims, agreeing with trial counsel's assessment that the only material issue to be resolved at sentencing was whether the Petitioner should be eligible for parole. The sentencing court indicated as much during sentencing, stating that life in prison was an appropriate sentence. ECF No. 7, Ex. 25 at 84-92; Ex. 8 at 26. Trial counsel argued for parole eligibility noting the Petitioner's potential for rehabilitation. The court agreed and sentenced the Petitioner according to trial counsel's request. *Id.*

The Petitioner has offered nothing in support of his position that this sentence would have been different if trial counsel had acted in the manner urged by the Petitioner.[13] The state court's rejection of the Petitioner's claims of ineffective assistance of counsel during sentencing was a reasonable application of *Strickland*, and relief is not warranted.

vi.   Cumulative Error

To the extent the Petitioner alleges that the cumulative errors of trial counsel entitle him to relief, his claim is denied. Pursuant to the cumulative error doctrine, "[t]he cumulative effect of two or more individually harmless errors has the potential to prejudice a defendant to the same

---

[13] *See United States v. Seyfert*, 67 F.3d 544, 548-49 (5th Cir. 1995) (in non-capital sentencing proceedings, prejudice prong of *Strickland* test requires defendant to establish reasonable probability that sentence would have been significantly less harsh); *United States v. Slaughter*, 900 F. 2d 1119, 1125 (7th Cir. 1990) (finding defendant failed to establish prejudice component of *Strickland* because additional effort by counsel would not have changed outcome).

extent as a single reversible error." *United States v. Rivera*, 900 F.2d 1462, 1469 (10th Cir. 1990); *see also United States v. Martinez*, 277 F.3d 517, 532 (4th Cir. 2002); *United States v. Basham*, 561 F.3d 302, 330 (4th Cir. 2009).

Generally, if a court "determine[s] . . . that none of [a defendant's] claims warrant reversal individually," it will "decline to employ the unusual remedy of reversing for cumulative error." *United States v. Fields*, 483 F.3d 313, 362 (8th Cir. 2007). To reverse for cumulative error, the errors must "so fatally infect the trial that they violated the trial's fundamental fairness." *Basham*, 561 F.3d at 330 (*quoting United States v. Bell*, 367 F.3d 452, 471 (5th Cir. 2004)). When "none of [the trial court's] individual rulings worked any cognizable harm [on the defendant] . . . [i]t necessarily follows that the cumulative error doctrine finds no foothold." *United States v. Sampson*, 486 F.3d 13, 51 (1st Cir. 2007). In the Fourth Circuit, the cumulative error doctrine is not generally recognized because "legitimate cumulative-error analysis evaluates only the effect of matters actually determined to be constitutional error, not the cumulative effect of all of counsel's actions deemed deficient."[14]

The post-conviction court found that, "[w]hile 'the cumulative effect of error's argument' may be a valid one in certain cases, it has no basis in this case . . . In the instant case, this Court notes for all the reasons stated that Mazelis's purported failures to investigate Brill's coaching of Ritter, to use that and Brill's confession and the DNA evidence and testimony available in this case, even when coupled with other imperfections noted herein, do not give rise either in

---

[14] *Fisher v. Angelone*, 163 F.3d 835, 852 n.9 (4th Cir. 1998); *see also Arnold v. Evatt*, 113 F.3d 1352, 1364 (4th Cir. 1997); *Higgs v. United States*, 711 F. Supp. 2d 479, 552 (D. Md. 2010) (on collateral review, review of the cumulative effect of errors is available only when individual

isolation, nor in combination, nor by cumulative effect, to add-up to be Post Conviction error(s) to support a grant of relief." *Id.* at 83. The Petitioner does not demonstrate the state court's adjudication "was contrary to, or involved an unreasonable application of, clearly established Federal Law, as determined by the Supreme Court of the United States," or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C § 2254(d). For these reasons, the claim provides no grounds for federal habeas corpus relief.

vii.     Conclusion about ineffective assistance claims

Even assuming that defense counsel's alleged failures were unreasonable, the Petitioner has failed to offer any evidence, much less establish, that but for counsel's alleged error, the outcome of his trial would have been different. Having examined the post-conviction court's rulings and having independently examined the record, this Court is satisfied that in applying the *Strickland* standard to the allegations of trial counsel's allegedly deficient performance, the Petitioner has not demonstrated the prejudice necessary to establish his trial attorney's ineffectiveness. *See* 28 U.S.C. § 2254(d); *Stamper v. Muncie*, 944 F.2d 170, 178 (4th Cir. 1991) (challenge to counsel's trial decisions and/or tactics amounted to no more than "Monday morning quarter-backing."). Accordingly, the Petitioner's claims of ineffective assistance of counsel are denied.

---

constitutional errors are found).

III. Conclusion

The record establishes, and this Court determines, that the Petitioner is not entitled to federal habeas relief. There is no basis upon which to find constitutional deficiencies in the state court proceedings, and the Petitioner has failed to rebut the presumption of correctness of the findings of fact underlying the rejection of post-conviction or appellate relief.

Additionally, a Certificate of Appealability is not warranted as it may issue "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U. S.C. § 2253(c)(2). The Petitioner "must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong,"[15] or that "the issues presented are adequate to deserve encouragement to proceed further."[16] Because this Court finds that there has been no substantial showing of the denial of a constitutional right, a Certificate of Appealability will not be issued. *See* 28 U. S.C. § 2253(c)(2).

Accordingly, the Petition will be dismissed with prejudice, and a Certificate of Appealability shall not issue. A separate Order follows.

1/17/14

Date

William D. Quarles, Jr.
United States District Judge

---

[15] *Tennard v. Dretke*, 542 U.S. 274, 282 (2004) (citation and internal quotation marks omitted),

[16] *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003).

33